A10A1278. NELSON et al. v. BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF GEORGIA et al.

(704 SE2d 868)

DILLARD, Judge.

Plaintiffs James Gary Nelson ("Nelson"), Deborah Nelson, Jeany Pontrelli, and Michael J. Pontrelli filed a medical malpractice action, seeking damages related to the allegedly negligent treatment Nelson received as a patient at the Medical College of Georgia ("MCG") hospital facility following his surgery to remove a brain

---

tumor. Plaintiffs named as defendants, among others, MCG Health, Inc. ("MCGHI"); Michael Cowan, M.D.; Peter Brown, M.D.; Samuel Macomsen, M.D.; and Christopher Ewart, M.D.

MCGHI failed to file a timely answer to the complaint, and thereafter filed a motion to open default, which the trial court granted. MCGHI then filed a motion for summary judgment, disclaiming liability for plaintiffs' claims. The trial court denied MCGHI's motion, and certified its decision for immediate review. We granted MCGHI's application for interlocutory appeal, and then affirmed the trial court's summary-judgment ruling.[1] After the remittitur was entered, MCGHI filed a second motion for summary judgment, incorporating an additional affidavit and evidence in support of same. Following a hearing, the trial court granted MCGHI's second motion for summary judgment.

In further proceedings before the trial court, Defendants Cowan, Brown, Macomsen, and Ewart ("the Resident Defendants") filed a motion to dismiss (claiming immunity from liability in the lawsuit), which was granted.

Plaintiffs filed the instant appeal, challenging the trial court's order granting MCGHI's motion to open default and second motion for summary judgment, as well as its decision granting the Resident Defendants' motion to dismiss.[2] For the reasons set forth infra, we affirm each of the trial court's decisions.

1. Plaintiffs first contend that the trial court abused its discretion in granting MCGHI's motion to open default. We disagree.

MCGHI was served with plaintiffs' complaint on September 13, 2000, but failed to file a timely answer within 30 days or open the default as a matter of right within 15 days as permitted by OCGA § 9-11-55 (a). On November 2, 2000, MCGHI moved to open the default,

---

[1] *MCG Health, Inc. v. Nelson*, 270 Ga. App. 409 (606 SE2d 576) (2004) (*"MCG Health I"*).

[2] On appeal, plaintiffs initially challenged the trial court's decision to grant the Board of Regents's renewed and amended motion to dismiss (which was based on plaintiffs' failure to comply with the state's statutory ante litem notice requirements), but abandoned this challenge in their reply brief. Plaintiffs' remaining enumerations of error concern matters that are being considered by this Court, pursuant to OCGA § 5-6-34 (d), which provides that, where a proper appeal is taken, an appellate court may also review other orders rendered in the case below, which are raised on appeal and may affect the proceedings, regardless of whether the other orders were independently appealable. *See, e.g., Roberts v. Windsor Credit Servs.*, 301 Ga. App. 393, 395 (1) (687 SE2d 647) (2009). Plaintiffs' decision to abandon their challenge to the trial court's order granting the Board of Regents's motion to dismiss does not deprive this Court of jurisdiction to consider the remaining orders that fall within the ambit of OCGA § 5-6-34 (d). *See, e.g., Murray v. DeKalb Farmers Mkt.*, 305 Ga. App. 523, 524 (699 SE2d 842) (2010) ("Even though none of the errors enumerated pertain to the directly appealable . . . dismissal [order] from which the appeal was taken, we have appellate jurisdiction pursuant to OCGA § 5-6-34 (d) to review other orders rendered in the case which may affect the proceedings and which are raised in the appeal." (citation and punctuation omitted)); *Roberts*, 301 Ga. App. at 394-95 (1) (same).

paid costs, filed an answer setting forth meritorious defenses, and announced that it was ready to proceed with trial. MCGHI then supplemented its motion with the affidavits of its director of risk management and chief financial officer, which set forth the basis for its defenses and the reasons for its failure to file a timely answer.

The affidavits explained that MCGHI was not involved in the daily operations of the hospital at the time of Nelson's treatment in September 1998, and that it did not take over the hospital's operations from MCG until July 1, 2000. When the complaint was subsequently served on September 13, 2000, MCGHI was still transitioning into its operation of the hospital and had not yet implemented a new procedure for handling lawsuits. Prior to this transition, all lawsuits against the hospital were handled by the Georgia Department of Administrative Services ("DOAS"), and MCGHI's employees mistakenly assumed that DOAS would also be handling this lawsuit (given that the alleged malpractice took place while the hospital was still under state control). Moreover, this was the first malpractice lawsuit filed against the hospital since MCGHI took over control of the facility's operations, and MCGHI's employees had no prior experience in handling and processing lawsuits. As a result, the employees failed to forward the complaint to the proper persons for handling. MCGHI discovered its error in failing to file a timely answer to the complaint on November 1, 2000, and took prompt remedial action to open the default on the following day.

Upon considering the averments set forth in MCGHI's motion to open default, as well as the supporting affidavits, the trial court found that a "proper case" had been established for the default to be opened and granted the motion. In doing so, the trial court did not abuse its discretion.

OCGA § 9-11-55 (b) allows a prejudgment default to be opened on one of three grounds: providential cause, excusable neglect, or a proper case.[3] As a condition precedent to the trial court's consideration of whether any of the three grounds has been met, the defendant must show compliance with four statutory conditions by (1) making a showing under oath, (2) setting up a meritorious defense, (3) offering to plead instanter, and (4) announcing ready to proceed with the trial.[4] And here, it is undisputed that MCGHI met the four preconditions for opening the default.

On appeal, plaintiffs limit their challenge to the trial court's determination that MCGHI's averments presented a proper case to

---

[3] OCGA § 9-11-55 (b); *see also Anderson v. Flake*, 270 Ga. 141, 143 (2) (508 SE2d 650) (1998); *Boggs Rural Life Ctr. v. IOS Capital*, 255 Ga. App. 847, 847 (567 SE2d 94) (2002).

[4] OCGA § 9-11-55 (b); *see also Anderson*, 270 Ga. at 143 (2); *Boggs Rural Life Ctr.*, 255 Ga. App. at 847.

allow the default to be opened,[5] arguing that (1) MCGHI did not provide the trial court with a "reasonable explanation" for its failure to file a timely answer to their complaint, and (2) the trial court was required to apply the more rigorous "excusable neglect" analysis in considering whether to open the default on the basis that MCGHI mistakenly assumed DOAS would be handling the defense of the lawsuit.

In considering the plaintiffs' argument, we begin by noting that

> [t]he "proper case" ground[,] under which the default was opened in this case[,] has been construed to confer discretion on the trial court broader than that conferred on the other two grounds[,] as if reaching out to take in every conceivable case where injustice might result if the default were not opened.[6]

Indeed, the sole function we have as an appellate court reviewing a trial court's grant of a motion to open default is to ascertain whether all of the conditions delineated in OCGA § 9-11-55 have been satisfied, and if so, "whether the trial court abused its discretion based on the facts peculiar to each case."[7] And because the public policy of this state strongly favors resolution of cases on their merits, the remedial provisions for opening a default are to be forgivingly applied.[8] For this reason, a default should generally be set aside "where the defendant acts with reasonable promptness and alleges a meritorious defense,"[9] so as to avoid a "drastic sanction" that "should be invoked only in extreme situations."[10] In sum, once the four preconditions have been satisfied by a defendant, the trial court is vested

---

[5] Plaintiffs' reliance on *In the Matter of Turk*, 267 Ga. 30 (471 SE2d 842) (1996) is misplaced, given that the discretion exercised in opening a default in an attorney-disciplinary proceeding lies exclusively with the Supreme Court of Georgia. *Id.* at 31 (1) ("Under OCGA § 9-11-55 (b), the determination of whether a 'proper case' exists is a matter within the trial court's discretion. Because of our inherent and exclusive power to regulate the practice of law, it is *this Court* that must exercise the ultimate discretion in disciplinary proceedings." (emphasis supplied)).

[6] *Legacy Hills Res. Ass'n. v. Colonial Bank*, 255 Ga. App. 144, 145 (564 SE2d 550) (2002) (citation and punctuation omitted); *see also ABA 241 Peachtree, LLC v. Brooken & McGlothen, LLC*, 302 Ga. App. 208, 210 (690 SE2d 514) (2010) (same).

[7] *ABA 241 Peachtree*, 302 Ga. App. at 210 (punctuation omitted); *see also Gilliam v. Love*, 275 Ga. App. 687, 687 (621 SE2d 805) (2005) (same); *Patterson v. Bristol Timber Co.*, 286 Ga. App. 423, 426-27 (2) (649 SE2d 795) (2007) (same).

[8] *See, e.g., Exxon Corp. v. Thomason*, 269 Ga. 761, 761-62 (1), (2) (504 SE2d 676) (1998); *Johnson v. Am. Nat'l Red Cross*, 253 Ga. App. 587, 589 (1) (569 SE2d 242) (2002); *Ford v. St. Francis Hosp.*, 227 Ga. App. 823, 826 (1) (490 SE2d 415) (1997).

[9] *Exxon Corp.*, 269 Ga. at 763 (2) (punctuation and footnote omitted).

[10] *NorthPoint Group Holdings, LLC v. Morris*, 300 Ga. App. 491, 493 (685 SE2d 436) (2009) (citation and punctuation omitted).

with broad discretion in determining whether to open a default on the "proper case" ground,[11] and we will not disturb a trial court's decision on this matter absent an abuse of its discretion.[12]

In the case sub judice, the record shows that, upon discovering the default, MCGHI acted promptly by filing a motion to open the default less than a week after the expiration of the time it could have done so as a matter of right (and one day after learning of the default), and plaintiffs have not demonstrated that they were prejudiced as a result of the default being opened or that the default delayed the litigation in any appreciable manner.[13] Furthermore, MCGHI alleged a meritorious defense to plaintiffs' claims in the lawsuit.[14] Under the foregoing circumstances, we conclude that the trial court did not abuse its broad discretion in opening the default.[15]

Contrary to plaintiffs' assertion, it is not for this Court to determine whether, in the first instance, the proffered justification given by MCGHI to the trial court as a basis for opening a default on the proper case ground is "reasonable." To do so undermines, to the point of eviscerating, the abuse of discretion standard of review we are charged with adhering to in these cases, and is wholly inconsistent with our long-established view that a trial court is to be given wide discretion in determining what is and is not a "proper case" for opening a default.[16] Put another way, this Court can (and should)

---

[11] See, e.g., Henderson v. Quadramed Corp., 260 Ga. App. 680, 680-81 (1) (580 SE2d 542) (2003); Majestic Homes v. Sierra Dev. Corp., 211 Ga. App. 223, 224 (1) (438 SE2d 686) (1993).

[12] See, e.g., Henderson, 260 Ga. App. at 681 (1); Majestic Homes, 211 Ga. App. at 224 (1).

[13] See, e.g., Vibratech, Inc. v. Frost, 291 Ga. App. 133, 145 (661 SE2d 185) (2008) (noting that "this Court has recognized a number of factors for determining whether opening default would be appropriate in a particular case, including," but not limited to,

> whether and how the opposing party will be prejudiced by opening the default; whether the opposing party elected not to raise the default issue until after the time under OCGA § 9-11-55 (a) had expired for the defaulting party to open default as a matter of right; and whether the defaulting party acted promptly to open the default upon learning no answer had been either filed or timely filed,

and "any additional delay occasioned by a failure to file promptly for opening default upon its discovery can be considered in determining whether defendants' neglect was excusable." (citation and punctuation omitted)); Ford, 227 Ga. App. at 826 (1) (same).

[14] See, e.g., Shortnacy v. N. Atlanta Internal Med., 252 Ga. App. 321, 324 (1) (556 SE2d 209) (2001) (noting that "the potential for manifest injustice exists in this case if default judgment is entered against the defaulting defendants because they have pled what appears to be a meritorious defense"); see also Vito v. Dhillon, 269 Ga. App. 899, 903 (2) (605 SE2d 602) (2004) (noting that opening default was appropriate when defendant met the requirements of OCGA § 9-11-55 (b), which includes alleging a meritorious defense); Whitley v. Bank S., 185 Ga. App. 896, 898 (2) (366 SE2d 182) (1988) (noting that opening default is appropriate when defendant "acts with reasonable promptness and alleges a meritorious defense" (citation and punctuation omitted)).

[15] See, e.g., Exxon Corp., 269 Ga. at 763 (2); Henderson, 260 Ga. App. at 682 (2); Johnson, 253 Ga. App. at 590-91 (1); Shortnacy, 252 Ga. App. at 323-24 (1).

[16] See, e.g., OCGA § 9-11-55 (b); Graham v. Atlanta Nat'l Bldg. & Loan Ass'n, 110 Ga. 278, 278 (2) (34 SE 847) (1899) ("It is within the discretion of the court . . . to allow a default to be

only evaluate the reasonableness of MCGHI's proffered justification for opening a default on the "proper case" ground in the context of considering whether the trial court's acceptance of this justification as a basis for opening the default amounts to a manifest abuse of discretion.[17]

Finally, plaintiffs' contention that our prior decision in *BellSouth Telecommunications v. Future Communications*[18] required the trial court to apply the more rigorous "excusable neglect" analysis in considering whether to open the default is without merit. Specifically, plaintiffs appear to read our decision in *BellSouth* as requiring a trial court to apply, as a matter of law, an excusable-neglect analysis in each and every case where a defendant mistakenly assumes that a lawsuit is being handled by another person or entity. Plaintiffs' understanding of our holding in *BellSouth* is erroneous.

While it is certainly true that some of the language employed in *BellSouth* is less than precise, it is likewise true, as MCGHI notes in its responsive brief, that there are several opinions of this Court upholding a trial court's decision to open a default on the "proper case" ground in circumstances virtually identical to those presented in the case sub judice.[19] Moreover, the precedential utility of this

---

opened . . . where, from all the facts, the court may determine that a proper case has been made for the default to be opened, on terms to be fixed by it."); *Houston v. Lowes of Savannah*, 136 Ga. App. 781, 783 (1) (222 SE2d 209) (1975) (noting in open default cases that "[w]ith only a cold record before us, this [C]ourt should not merely substitute its judgment for that of the trial judge"); *see also Henderson*, 260 Ga. App. at 681 (1); *Majestic Homes*, 211 Ga. App. at 224 (1).

[17] *See Colonial Penn Life Ins. Co. v. Mkt. Planners Ins. Agency*, 209 Ga. App. 562, 563 (434 SE2d 124) (1993) ("If the record sustains the decision to open default under any of the three grounds noted in the statute (providential cause, excusable neglect, and a proper case), this [C]ourt will affirm the trial court's action." (citation and punctuation omitted)); *Thompson v. Kelsey*, 8 Ga. App. 23, 23 (68 SE 518) (1910) (holding that the trial court's discretion to open a default "should be given a liberal construction, in the promotion of justice and the establishment of the truth; and [a trial court's decision] permitting the defendant to plead will not be interfered with by a reviewing court, unless manifestly abused, to the injury of the plaintiff").

[18] 293 Ga. App. 247 (666 SE2d 699) (2008).

[19] *See, e.g., Ford*, 227 Ga. App. at 825 (affirming trial court's decision to open default on "proper case" ground where "affidavit of the hospital's risk management officer showed it was his duty to forward the complaint to counsel and the hospital's insurer . . . [that] he received the complaint . . . but did not know exactly why it was not answered," and that it was possible "he had overlooked the complaint . . . believ[ing] the hospital's standard procedure would result in an answer being filed in this case, as in the others which preceded it"); *Johnson*, 253 Ga. App. at 590 (affirming trial court's decision to open default on "proper case" ground where "affidavit shows that the complaint was served on the Medical Director . . . ; that the Risk Management Division did not receive the complaint . . . ; that there was a misunderstanding in the office of the General Counsel which led the Red Cross to [mistakenly] believe that the complaint was being handled properly; and that immediately upon receiving the complaint, the Risk Management Division forwarded it to the third-party administrator . . . , who sent it to outside counsel"). *Compare NorthPoint Group Holdings, LLC*, 300 Ga. App. at 493 (affirming trial court's refusal to open default on "proper case" ground where defendants provided no reasonable explanation for the default, merely stated that "it is unclear what happened," and

Court's reasoning and holding in *BellSouth* is significantly constrained by the fact that the trial court in that case opened the default "without an explanation of the legal or factual basis for doing so,"[20] which apparently precluded us from being able to identify a reasonable basis for the trial court's decision to open the default. Finally, it is important for litigants to keep in mind that these "default cases" often turn on a variety of factors (e.g., the trial court's discretionary judgment, factual subtleties), and that "no two are alike, and each must be judged on its own merits."[21] In any event, plaintiffs are wrong to read our decision in *BellSouth* as holding that the "proper case" ground for opening a default is subsumed into the "excusable neglect" ground in each and every case where a defendant mistakenly assumes that a lawsuit is being handled by another person or entity.

2. Plaintiffs further contend that the trial court violated "the law of the case" by granting MCGHI's second motion for summary judgment after this Court's decision in the first appeal, *MCG Health I*.[22] Once again, we disagree.

In filing its first motion for summary judgment, MCGHI argued that it did not operate the hospital, employ any of the persons involved in Nelson's treatment, or exercise control over the actions of Nelson's medical providers at the time of his treatment in September 1998. Although it is undisputed that MCGHI was not operating the hospital at the time the cause of action arose, Nelson, nevertheless, opposed MCGHI's motion on the ground that it assumed liability for the claims against the hospital pursuant to several transfer agreements (pertaining to MCGHI's acquisition of the hospital). And based upon the assumption-of-liability terms contained in those agreements, the trial court denied MCGHI's motion for summary judgment and certified its decision for immediate review. We granted MCGHI's application for interlocutory appeal, and then (in *MCG Health I*) affirmed the trial court's summary-judgment ruling.[23] In doing so, we noted MCGHI's argument that it had not assumed liability for plaintiffs' claims because the transfer

did not dispute that they were properly served or that the cases fell into default).

[20] 293 Ga. App. at 248.

[21] *Butterworth v. Safelite Glass Corp.*, 287 Ga. App. 848, 851 n.16 (652 SE2d 877) (2007) (describing the holding of *Follmer v. Perry*, 229 Ga. App. 257, 259 (1) (493 SE2d 631) (1997)).

[22] The arguments presented in plaintiffs' appellate brief are limited to addressing the procedural validity of the trial court's decision under the law of the case rule. Because plaintiffs' arguments do not address the substantive merits of the trial court's decision granting MCGHI's second motion for summary judgment, those claims are deemed to be abandoned. Court of Appeals Rule 25 (c) (2) ("Any enumeration of error which is not supported in the brief by citation of authority or argument may be deemed abandoned.").

[23] *MCG Health I*, 270 Ga. App. at 409-12 (1)-(3).

agreements specifically excluded pre-transfer liabilities covered by the programs of insurance and self-insurance maintained by DOAS,[24] but found that contention unavailing because MCGHI had not pointed to any record evidence establishing the existence of such insurance coverage.[25] Accordingly, based upon the evidence then presented, we affirmed the denial of MCGHI's motion for summary judgment under this claim.[26]

Following the entry of remittitur from *MCG Health I*, MCGHI filed a second motion for summary judgment that included a supplemental affidavit and evidence supporting its argument that plaintiffs' claims fell within the excluded liabilities under the transfer agreements. In the supplemental affidavit, MCGHI's vice president of legal affairs attested that he was familiar with the programs of liability insurance and self-insurance maintained by DOAS during the relevant time period of September 1998, and that these liability-insurance policies covered the Board of Regents, MCG, doctors, residents, and nurses named as defendants in the lawsuit. Moreover, attached to the affidavit were copies of the State Tort Claims Policy and Broad Form State Employee Liability Agreement that provided the pertinent coverage and conclusively established that the plaintiffs' claims fell within the excluded liabilities that had not been assumed by MCGHI under the transfer agreements. Upon the submission and consideration of this additional evidence, the trial court granted MCGHI's second motion for summary judgment.

On appeal, plaintiffs contend that our prior decision in *MCG Health I*, affirming the trial court's *denial* of MCGHI's first motion for summary judgment, established the law of the case, which they claim the trial court violated in its subsequent decision granting MCGHI's second motion for summary judgment. Plaintiffs are mistaken.

The law of the case rule, codified by OCGA § 9-11-60 (h), provides that "any ruling by the Supreme Court or the Court of Appeals in a case shall be binding in all subsequent proceedings in that case in the lower court and in the Supreme Court or the Court of Appeals as the case may be." Under this provision, "[t]he 'law of the case' rule, though formally abolished, still applies to rulings by one of our appellate courts in a particular case[.]"[27] Significantly, however, an exception exists where "the evidentiary posture of the case changes in the trial court after the appellate court decision," so as to

---

[24] *Id.* at 412 (2).

[25] *Id.*

[26] *Id.*

[27] *IH Riverdale, LLC v. McChesney Capital Partners*, 292 Ga. App. 841, 843 (666 SE2d 8) (2008) (punctuation and footnote omitted).

"bar application of the law of the case rule when the original evidence submitted is found to be insufficient, and the deficient evidence is later supplemented."[28]

Proper application of the law of the case rule, then, requires that an important procedural distinction be drawn between the granting and denial of a summary judgment. As we have previously explained:

> Granting a summary judgment is a decision on the merits and ends the case; amendments and subsequent motions for summary judgment made after this decision on the merits are too late. *Denial of a motion for summary judgment decides nothing except that under the evidence before the court at that time there can be rendered no judgment as a matter of law.*[29]

Accordingly, "the previous denial of summary judgment does not preclude a subsequent granting thereof on the basis of an expanded record."[30]

And here, after remittitur, MCGHI changed the evidentiary posture of the case by submitting the additional affidavit and insurance policies that supported its disclaimer of liability under the transfer agreements. In turn, this submission expanded the record to supplement the evidentiary deficiency noted in *MCG Health I*, and demonstrated that the plaintiffs' claims fell within the purview of the excluded liabilities MCGHI had not assumed under the transfer agreements. Contrary to plaintiffs' claim,[31] the trial court did not violate the law of the case rule by considering MCGHI's supplemental evidence supporting its second motion for summary judgment

---

[28] *Id.* (punctuation and footnotes omitted); *see also Brown v. Piggly Wiggly S.*, 228 Ga. App. 629, 629 (1) (493 SE2d 196) (1997) (same); *MOM Corp. v. Chattahoochee Bank*, 203 Ga. App. 847, 847 (1) (418 SE2d 74) (1992) ("'[F]ollowing appellate review of summary judgment, 'the law of the case' rule does not limit or prohibit the trial court from receiving new evidence which changes the evidentiary posture of the case." (citations and punctuation omitted)).

[29] *Ellington v. Tolar Constr. Co.*, 142 Ga. App. 218, 221 (1) (235 SE2d 729) (1977) (emphasis supplied).

[30] *Id.* (citation omitted).

[31] Plaintiffs' citations to *Black v. Floyd*, 280 Ga. 525, 526-27 (1) (630 SE2d 382) (2006), *McDaniel v. City of Griffin*, 281 Ga. App. 350, 352-53 (1) (636 SE2d 62) (2006), and *Lowman v. Advanced Drainage Sys.*, 228 Ga. App. 182, 183-85 (491 SE2d 427) (1997) are unavailing, as these decisions merely stand for the proposition that a party may not present a new defense or relitigate a claim following the entry of summary judgment or a final judgment in the opposing party's favor. Because the procedural posture in those cases involved the *grant* of summary judgment or the entry of a final judgment in favor of a party, they are distinguishable and are inapplicable to the instant case involving the expansion of the record following the *denial* of summary judgment. *See, e.g., MOM Corp.*, 203 Ga. App. at 847-48 (1); *Ellington*, 142 Ga. App. at 219-221 (1).

and granting same.[32]

3. Lastly, plaintiffs contend that the trial court erred in granting the Resident Defendants' motion to dismiss on the ground of qualified immunity.[33] Again, we disagree.

Except as provided in the Georgia Tort Claims Act ("GTCA"),[34] "officers and employees of the state or its departments and agencies shall not be subject to suit or liability, and no judgment shall be entered against them, for the performance or nonperformance of their official functions."[35] The provisions of the GTCA further declare, as the public policy of this state, that "state officers and employees shall not be subject to lawsuit or liability arising from the performance or nonperformance of their official duties or functions."[36]

In the case sub judice, the Resident Defendants filed a motion to dismiss, claiming entitlement to qualified immunity under the aforementioned provisions, and providing uncontroverted affidavits and deposition testimony establishing that the treatment they provided to Nelson was in their capacities as resident physicians in the MCG program. The uncontroverted evidence further established that as residents (1) they had no hospital privileges and were only able to practice under institutional licenses granted to them pursuant to OCGA § 43-34-33,[37] (2) the treatment they provided was controlled by and under the supervision of the attending physician, (3) they had no choice as to the patients that they treated or the physicians to whom they were assigned to during clinical rotations, (4) they had no private-pay relationship with Nelson, and (5) their pay was limited to a fixed stipend paid by MCG and the Board of Regents.

Given the foregoing, we conclude that the Resident Defendants' qualified immunity claim is controlled by our decision in *Bonner v.*

---

[32] *See, e.g., MOM Corp.*, 203 Ga. App. at 847-48 (1); *Lee v. Dep't of Transp.*, 198 Ga. App. 716, 716-17 (402 SE2d 551) (1991); *Ellington*, 142 Ga. App. at 219-21 (1).

[33] The trial court also granted the Resident Defendants' motion to dismiss based upon immunity provided to voluntary health care providers, OCGA § 51-1-29.1 (a), and to medical students, OCGA § 51-1-38 (a). But in light of our decision upholding the dismissal on the ground of qualified immunity under the GTCA, we need not reach the merits of these alternative grounds. We, nevertheless, note that because resident physicians already have medical degrees, and are at least provisionally licensed to practice medicine, they are not extended immunity under the provisions of OCGA § 51-1-38 (a). *See, e.g., Bonner v. Peterson*, 301 Ga. App. 443, 448-49 (2) (a) (687 SE2d 676) (2009).

[34] OCGA § 50-21-20 *et seq.*

[35] Ga. Const. of 1983, Art. I, Sec. II, Par. IX (d).

[36] OCGA § 50-21-21 (b); *see also* OCGA § 50-21-25 (a).

[37] Under OCGA § 43-34-33 (a) (1998), a graduate of an accredited and approved medical school, who was employed by an approved state medical college, could be granted an institutional license authorizing such physician to practice medicine under proper medical supervision.

*Peterson,*[38] in which we held that a resident physician at MCG was entitled to qualified immunity under the GTCA for the treatment he provided to the plaintiff patient.[39] Indeed, the circumstances presented in *Bonner* are substantially similar to those involved in this case:

> [T]he record show[ed] that resident physicians, unlike attending physicians, are subject to the control and direction of others. Specifically, resident physicians work under and are supervised by attending physicians. They have no hospital privileges and they are not empowered to make any unilateral decisions regarding the treatment of patients. Patients do not make appointments with resident physicians and residents have no control over which patients they see. Instead, resident physicians treat patients who are also being treated by an attending physician. Additionally, unlike attending physicians, resident physicians receive no compensation, either directly or indirectly, from any patient. Rather their only compensation is paid by MCG, and that compensation does not vary based upon either the number of patients seen or the number of procedures performed.[40]

Based upon these factors and circumstances, we concluded that "state-employed resident physicians are entitled to immunity from liability arising from their treatment of patients during the course of their residency."[41]

Plaintiffs, nevertheless, contend that *Bonner* was erroneously decided, and cannot be reconciled with the Supreme Court of Georgia's decision in *Keenan v. Plouffe,*[42] which held that an attending physician and faculty member at MCG was not acting within the scope of his state employment—and thus not entitled to qualified immunity—when he performed surgery on a "private-pay" patient. Plaintiffs' contention is without merit.

As fully explained in *Bonner*, the circumstances of a state-employed resident physician are easily distinguishable from those of an attending physician who has agreed to treat a patient under a private-pay arrangement.[43] In light of the restrictions placed upon

---

[38] 301 Ga. App. 443 (687 SE2d 676) (2009).

[39] *Id.* at 449-52 (2) (b).

[40] *Id.* at 451 (2) (b).

[41] *Id.* at 451-52 (2) (b).

[42] 267 Ga. 791, 793-94 (2) (482 SE2d 253) (1997).

[43] *See generally* 301 Ga. App. at 451-52 (2) (b).

the Resident Defendants' discretion in providing treatment under supervision and the restrictions of their institutional licenses, the circumstances surrounding their provision of treatment are clearly distinguishable from those of an attending physician whose medical treatment is not similarly restricted.[44] Based upon the foregoing restrictions, as well as the evidence establishing that the Resident Defendants were acting within the scope of their duties as MCG residents when they assisted in Nelson's treatment, we hold that they were clearly entitled to immunity under the GTCA.[45]

We likewise reject the plaintiffs' argument that the Resident Defendants should not be granted immunity to the extent that they were covered by liability insurance. While it is true that Ga. Const. of 1983, Art. I, Sec. II, Par. IX previously waived sovereign immunity to the extent that liability insurance was provided,[46] this provision was amended, effective January 1, 1991, to delete the insurance-waiver clause, and to instead provide that the extent of the state's waiver of sovereign immunity was provided under the GTCA.[47] Because plaintiffs' action accrued after January 1, 1991, the insurance waiver of sovereign immunity does not apply.[48]

In sum, the Resident Defendants were entitled to immunity under OCGA § 50-21-25 (a), and the trial court's decision granting their motion to dismiss was proper.[49]

*Judgment affirmed. Barnes, P. J., and Blackwell, J., concur.*

DECIDED DECEMBER 1, 2010 — 

*Steven L. Beard, Charles M. Cork III*, for appellants.
*Thurbert E. Baker, Attorney General, J. David Stubins, Assistant Attorney General, Hull & Barrett, James S. V. Weston*, for appellees.

---

[44] Indeed, because the Resident Defendants were providing treatment under institutional licenses, they were forbidden from engaging in the type of private arrangement that existed in *Keenan*. The provisions of OCGA § 43-34-33 (c) (1998) mandated that "[a] person issued an institutional license . . . shall not engage in the private practice of medicine and shall not receive fees or other remuneration from his patients. Persons practicing medicine pursuant to an institutional license . . . shall receive as their sole remuneration for the practice of medicine the salary and other remuneration paid by the institution."

[45] *See* OCGA § 50-21-25 (a); *Bonner*, 301 Ga. App. at 451-52 (2) (b).

[46] *See, e.g., Curtis v. Bd. of Regents of Univ. Sys. of Ga.*, 262 Ga. 226, 227 (416 SE2d 510) (1992).

[47] *Id.*

[48] *See, e.g., id.* at 227-228.

[49] *See, e.g., Bonner*, 301 Ga. App. at 449-52 (2) (b).